# United States Court of Appeals
## For the First Circuit

No. 19-1243

UNITED STATES DEPARTMENT OF JUSTICE,

Petitioner, Appellee,

v.

MICHELLE RICCO JONAS,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Howard, Chief Judge,
and Thompson,* Circuit Judge.

Anthony J. Galdieri, Senior Assistant Attorney General,
with whom Gordon J. MacDonald, Attorney General, and Lawrence M.
Edelman, Assistant Attorney General, were on brief, for Appellant.
Seth R. Aframe, Assistant United States Attorney, with
whom Scott W. Murray, United States Attorney, was on brief, for
Appellee.
Nathan Freed Wessler, with whom Brett Max Kaufman and
Jennifer Stisa Granick were on brief, for American Civil Liberties
Union Foundation, amicus curiae.
Gilles R. Bissonnette and Henry Klementowicz, on brief

---

* Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion. The remaining two panelists
therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

for ACLU of New Hampshire Foundation, amicus curiae.

Zachary L. Heiden and Emma E. Bond, on brief for American Civil Liberties Union of Maine, amicus curiae.

Matthew R. Segal and Jessie J. Rossman, on brief for American Civil Liberties Union Foundation of Massachusetts, Inc., amicus curiae.

William Ramírez, on brief for American Civil Liberties Union of Puerto Rico, amicus curiae.

Robert B. Mann and Robert B. Mann Law Office, on brief for ACLU of Rhode Island, amicus curiae.

January 27, 2022

**HOWARD**, **Chief Judge**. Respondent-appellant Michelle Ricco Jonas ("Ricco Jonas"), the Program Manager for New Hampshire's Prescription Drug Monitoring Program (the "PDMP"), appeals from a district court judgment ordering compliance with an administrative subpoena issued to her by the United States Drug Enforcement Administration ("DEA") pursuant to 21 U.S.C. § 876, to produce the PDMP-kept prescription drug records of an individual.[1] On appeal, Ricco Jonas contends that the subpoena is unenforceable because, although it was issued to her and 21 U.S.C. § 876(c) authorizes the enforcement of a "subp[o]ena issued to any person," in her view, the subpoena really targeted the State of New Hampshire and states are not "person[s]" within the meaning of 21 U.S.C. § 876(c) against whom administrative subpoenas may be issued and enforced. Additionally, she argues that, even if 21 U.S.C. § 876(c) generally authorizes the enforcement of administrative subpoenas against a state, the Fourth Amendment still poses a bar to compliance because the subpoena-specified individual has a reasonable expectation of privacy in his prescription drug records, thereby allowing disclosure only after a finding of probable cause by a court. After careful

---

[1] During the pendency of this appeal, Ricco Jonas informed us that she is no longer the PDMP program manager. Nevertheless, neither party has suggested that the appeal is moot.

- 3 -

consideration, we reject both of Ricco Jonas's contentions and affirm the district court judgment.

## I. **STATUTORY BACKGROUND**

### A. **The Controlled Substances Act**

In 1970, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act (the "Act"), Pub. L. No. 91-513, 84 Stat. 1236, to "consolidate various drug laws on the books into a comprehensive statute, provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels, and strengthen law enforcement tools against the traffic in illicit drugs." Gonzales v. Raich, 545 U.S. 1, 10 (2005). The main objectives of Title II of the Act, the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq., are "to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances."[2]  Raich, 545 U.S. at 12; id. at 12-13 ("Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.").  To achieve these goals, Congress established a "closed regulatory

_____

[2]  The CSA categorizes controlled substances into five schedules (I through V), based on the drugs' potential for abuse, accepted medical uses, and likelihood of causing psychological or physical dependency.  21 U.S.C. § 812.  Drugs categorized in schedules II through V have "a currently accepted medical use in treatment in the United States" or "a currently accepted medical use with severe restrictions."  Id. §§ 812(b)(2)-(5).  Schedule I drugs do not have any accepted medical use.  Id. § 812(b)(1).

system" that makes it unlawful "to manufacture, distribute, dispense, or possess any controlled substance except as authorized by the CSA." Id. at 13 (citing 21 U.S.C. §§ 841(a)(1), 844(a)). As part of this regulatory system, "[t]he CSA requires manufacturers, physicians, pharmacies, and other handlers of controlled substances to comply with statutory and regulatory provisions mandating registration with the DEA, compliance with specific production quotas, security controls to guard against diversion, recordkeeping and reporting obligations, and prescription requirements." Id. at 27 (citing 21 U.S.C. §§ 821-830; 21 C.F.R. § 1301 et seq. (2004)).

The CSA authorizes the Attorney General to issue administrative subpoenas to investigate suspected illicit drug activity. See 21 U.S.C. § 876. Specifically, § 876(a) of the statute provides in relevant part that,

> In any investigation . . . with respect to controlled substances . . . the Attorney General may subpe[o]na witnesses, compel the attendance and testimony of witnesses, and require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation. The attendance of witnesses and the production of records may be required from any place in any State or in any territory or other place subject to the jurisdiction of the United States . . . .

Id. § 876(a). The Attorney General has delegated this authority to the DEA. See id. § 878(a)(2); 28 C.F.R. §§ 0.100, 0.104, Appendix to Subpart R, Section 4.

Section 876(c) of the CSA provides for judicial enforcement of subpoenas issued under § 876(a). It states that,

> In the case of contumacy by or refusal to obey a subp[o]ena issued to any person, the Attorney General may invoke the aid of any court of the United States within the jurisdiction of which the investigation is carried on or of which the subp[o]enaed person is an inhabitant, or in which he carries on business or may be found, to compel compliance with the subp[o]ena. The court may issue an order requiring the subp[o]enaed person to appear before the Attorney General to produce records, if so ordered, or to give testimony touching the matter under investigation. Any failure to obey the order of the court may be punished by the court as a contempt thereof. All process in any such case may be served in any judicial district in which such person may be found.

21 U.S.C. § 876(c). The CSA provides that state law is preempted whenever "there is a positive conflict between [a] provision of th[e] [CSA] and [a] State law so that the two cannot consistently stand together." Id. § 903.

## B. The PDMP and New Hampshire Law

In 2012, the New Hampshire legislature established the PDMP to "enhanc[e] patient care, curtail[] the misuse and abuse of controlled substances, combat[] illegal trade in and diversion of controlled substances, and enabl[e] access to prescription information by practitioners, dispensers, and other authorized individuals and agencies."[3] New Hampshire PDMP, https://www.newhampshirepdmp.com/ (last visited Jan. 27, 2022).

---

[3] The PDMP is currently administered by the New Hampshire Department of Health and Human Services. N.H. Rev. Stat. Ann.

- 6 -

The PDMP operates an electronic system that "facilitate[s] the confidential sharing of information relating to the prescribing and dispensing of schedule II-IV controlled substances" within the State.  N.H. Rev. Stat. Ann. § 126-A:90. Every dispenser -- "a person or entity who is lawfully authorized to deliver a schedule II-IV controlled substance" -- must report certain information each time a schedule II-IV drug is dispensed, including:  dispenser's DEA registration number; prescriber's DEA registration number; patient's name, address, and date of birth; National Drug Code[4] of drug dispensed; quantity dispensed; date of dispensing; number of refills granted; whether the prescription is new or a refill; and, source of payment, among others.  Id. §§ 126-A:89(VI), 126-A:91(VI)(a)-(o).  This information is then stored in the PDMP database.[5]

New Hampshire state law provides that all information contained in or obtained from the PDMP "is confidential," and "is

_____

§§ 126-A:89-:96.  The PDMP has been previously administered by the New Hampshire Office of Professional Licensure and Certification and the New Hampshire Board of Pharmacy.

[4] National Drug Codes are unique, three-segment numbers which serve as identifiers for drugs.  U.S. Food and Drug Administration, National Drug Code Directory, https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory (last visited Jan. 27, 2022).

[5] The information is deleted from the database three years "after the initial prescription was dispensed."  N.H. Rev. Stat. Ann. § 126-A:90(III).

- 7 -

not subject to discovery, subpoena, or other means of legal compulsion for release."[6] Id. § 126-A:92(I). Law enforcement may request information from the PDMP "on a case-by-case basis for the purpose of investigation and prosecution of a criminal offense when presented with a court order based on probable cause." Id. § 126-A:93(I)(b)(3). However, "[n]o law enforcement agency or official shall have direct access to query program information." Id.

In addition to the state-kept PDMP database, New Hampshire also requires practitioners -- including physicians, pharmacists, and hospitals -- to maintain their own, similar records "to show the receipt and disposition of all controlled drugs." Id. § 318-B:12(I). These practitioners' records must "meet the requirements of the department of health and human services and federal laws and regulations," and "shall indicate at least the name, dosage form, strength, and quantity of the controlled drug; the name and address of any person to whom the drug was administered, dispensed, sold or transferred and the date of any and all transactions involved with the controlled drug." Id. Unlike PDMP data, law enforcement officials may access a

---

[6] The Department of Health and Human Services "may use and release information and reports from the program for program analysis and evaluation, statistical analysis, public research, public policy, and educational purposes, provided that the data are aggregated or otherwise de-identified at all levels of use." Id. § 126-A:92(III).

practitioner's own records without a court order. Id. § 318-B:12(II) ("[Practitioners' records] shall be open for inspection only to federal, state, county and municipal law enforcement officers [and others] . . . whose duty it is to enforce the laws of [New Hampshire] or of the United States relating to controlled drugs.").

## II. **FACTUAL AND PROCEDURAL BACKGROUND**

On June 11, 2018, the DEA issued an administrative subpoena to "Michelle Ricco Jonas, Program Manager for the NH PDMP" pursuant to 21 U.S.C. § 876(a). The subpoena, which was served on Ricco Jonas on June 13, 2018, stated that "[p]ursuant to an investigation of violations of 21 U.S.C. 801 et seq., [she was] to provide any and all records regarding [REDACTED], being maintained by the New Hampshire Prescription Drug Monitoring Program from February 28, 2016 through present day."[7]

On July 12, 2018, Ricco Jonas objected to the subpoena in a letter from the New Hampshire Attorney General's Office sent

---

[7] The DEA had previously served an administrative subpoena on the PDMP requesting the same information. The New Hampshire Attorney General objected on the ground that the CSA allegedly does not authorize the DEA to subpoena states or their sovereign agencies. He further argued that, although pursuant to § 876(c) of the CSA the DEA could enforce a subpoena against "any person," neither the State nor its sovereign agencies were "persons" against whom the subpoena could be enforced. Without conceding the point, the DEA subsequently served the subpoena naming Ricco Jonas.

to the DEA.  The letter stated that the subpoena was issued to her in her official capacity as the Program Manager of the PDMP, rather than in her personal capacity, and thus amounted to a subpoena issued to the State.  According to Ricco Jonas, because 21 U.S.C § 876 does not authorize the DEA "to subpoena a [s]tate, its sovereign agencies, or its officials serving in their official capacities," the subpoena was unenforceable.  The letter directed the DEA to follow state law and obtain a court order based on probable cause to obtain the desired information.

On August 8, 2018, the Department of Justice ("DOJ") filed a petition to compel compliance with the administrative subpoena in the United States District Court for the District of New Hampshire.  In its petition, the DOJ addressed Ricco Jonas's objections from the July 12 letter and argued that those objections failed because the subpoena was issued to Ricco Jonas in her personal capacity and sought no relief from the State.  In addition, the DOJ contended that even if the subpoena was directed to the State of New Hampshire, it was nonetheless enforceable because, as a matter of statutory interpretation, the CSA's use of "any person" in § 876(c) includes a state and its agencies. Finally, the DOJ submitted that the CSA preempts any state law limitations on the DEA's authority to issue administrative subpoenas.

Ricco Jonas opposed the petition for essentially the same reasons she asserted in the July 12 letter, along with a new argument based upon the Fourth Amendment. Ricco Jonas contended that even if the CSA permits the issuance of subpoenas to states, patients have a reasonable expectation of privacy in their prescription drug records under the Fourth Amendment and the DEA must therefore secure a court order based on probable cause before it can obtain PDMP data.

After a hearing, a magistrate judge issued a Report and Recommendation ("R&R") in which she recommended that the court grant the DOJ's petition to compel. U.S. Dep't of Justice v. Ricco Jonas, No. 18-MC-56-LM, 2018 WL 6718579, at *1 (D.N.H. Nov. 1, 2018). The magistrate judge rejected Ricco Jonas's "proposition that her being served because of her position as PDMP manager convert[ed] th[e] subpoena enforcement action [under 21 U.S.C. § 876(c)] into a suit against the State of New Hampshire." Id. at *3. She reasoned that because the subpoena enforcement proceeding would not result in a judgment of any kind requiring financial payment from the State, it was not a suit against the State. Id. The magistrate judge found that the DEA issued the subpoena to Ricco Jonas because she had "custody and control over PDMP information," id., and reasoned that whether she must comply with it in her official or personal capacity was "irrelevant." Id. at *4, *5 n.5. In light of this, the magistrate judge deemed it

- 11 -

unnecessary to reach the issue of statutory interpretation and decide whether a state is a "person" under 21 U.S.C. § 876(c) subject to the DEA's subpoena power. Id. at *4. The magistrate judge next determined that the CSA preempted New Hampshire's statutory requirement that law enforcement officials obtain an order based on probable cause before obtaining PDMP data. Id. at *4-5. Finally, because she deemed the issue non-dispositive, the magistrate judge assumed without deciding that Ricco Jonas had standing -- either in her own right or on behalf of others -- to make the Fourth Amendment argument. Id. at *6. Nonetheless, she concluded that patients have no reasonable expectation of privacy in their prescription drug records. Id. She reasoned that the closely regulated nature of the prescription drug industry, the state law requirement that the information be transmitted to the PDMP, and its provisions allowing that the data be shared in certain limited circumstances "operate to diminish the privacy expectation in prescription drug records." Id. at *6-7.

After additional briefing from both sides, the district court adopted the R&R and entered judgment in the DOJ's favor. U.S. Dep't of Justice v. Ricco Jonas, No. 19-CV-030-LM, 2019 WL 251246 (D.N.H. Jan. 17, 2019). Ricco Jonas timely appealed.

## III. DISCUSSION

On appeal, Ricco Jonas challenges the district court's conclusions that the subpoena is enforceable under 21 U.S.C. § 876(c) and that the Fourth Amendment poses no bar to the disclosure of the prescription drug records to the DEA without a court order based on probable cause.

We review a district court's decision to enforce an administrative subpoena for abuse of discretion, even if it "implicate[s] the privacy interests protected by the Fourth Amendment" or other questions of law. McLane Co. v. EEOC, 137 S. Ct. 1159, 1169-70 (2017). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); Drysdale v. Spirito, 689 F.2d 252, 256 (1st Cir. 1982) (noting that issues of statutory construction are legal issues).

## A.   The Target of the Administrative Subpoena

"The requirements for enforcement of an administrative subpoena are not onerous." United States v. Sturm, Ruger & Co., 84 F.3d 1, 4 (1st Cir. 1996). "In order to obtain judicial backing the agency must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." Id. (citing United States v. Morton Salt Co., 338

U.S. 632, 652 (1950)). Only the first requirement is at issue here. A challenge to a subpoena on that ground alone will fail "[a]s long as the agency's assertion of authority is not obviously apocryphal." Id. at 5-6 (citing FTC v. Swanson, 560 F.2d 1, 2 (1st Cir. 1977)).

The CSA provides that administrative subpoenas may be issued "[i]n any investigation relating to . . . controlled substances" to "require the production of any records . . . which the [DEA] finds relevant or material to the investigation . . . from any place in any State." 21 U.S.C. § 876(a). The CSA includes an enforcement mechanism that allows the DEA to invoke the aid of federal courts "[i]n case of contumacy by or refusal to obey a subp[o]ena issued to any person." Id. § 876(c).

Although Ricco Jonas does not dispute the DEA's congressional authority under 21 U.S.C. § 876(a) to issue a subpoena to her, she contends that, because in order to comply with the subpoena she would need to use her state-issued credentials to access state-collected data and provide it to the DEA, the State of New Hampshire is the subpoena's "true target." This, in her view, makes the instant subpoena one issued to the State, and this enforcement proceeding a "suit" against the State. She posits that the CSA does not authorize courts to enforce subpoenas issued to states because, under her reading of 21 U.S.C. § 876(c), states are not "person[s]" to whom subpoenas may be

issued.  Accordingly, she concludes, the instant subpoena was not "issued for a congressionally authorized purpose" and is not enforceable.

In response, the DOJ argues that the DEA issued its subpoena to Ricco Jonas, not to the State of New Hampshire, and that "requiring a state employee to produce records is not compelling the state to act; it is requiring the employee to act by producing records over which she has control."  The DOJ further argues that, even if the instant subpoena is deemed to have been issued to the State, it is enforceable because 21 U.S.C. § 876 authorizes the issuance and enforcement of subpoenas against states.

To support her argument that the instant subpoena was issued to the State and that this enforcement proceeding constitutes a suit against the State, Ricco Jonas invokes the principle, often arising in the Eleventh Amendment sovereign immunity context, that a suit against a state employee seeking relief from a state is a suit against the state.  But even under case law applying that principle, courts have rejected the invitation by state officers to blur the distinction between state officers and the states.  Instead, courts have validated the service of process to state officers for the production of documents or objects in their possession or control as persons independent of the states, and regardless of whether the states

elect to defend on behalf of their officers. See, e.g., Fla. Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 691-92 (1982) (plurality holding that service of process served on state officials for the transfer of some property in the state officials' possession "was directed only at state officials and not at the State itself or any agency of the State" and thus did not constitute a "direct action against the State" under the Eleventh Amendment even if "the State elected to defend on behalf of its agents"); Barnes v. Black, 544 F.3d 807, 812 (7th Cir. 2008) (noting that orders commanding non-party state officials to produce documents in the states' possession for use in a litigation between private persons "do not compromise state sovereignty to a significant degree," hence, do not violate the Eleventh Amendment); Laxalt v. McClatchy, 109 F.R.D. 632, 634-35 (D. Nev. 1986) (rejecting claim by the Nevada State Gaming Control Board that the Eleventh Amendment barred compliance with a federal discovery subpoena served upon the Board's custodian of records for inspection and copying of records).

Furthermore, even under the principle on which Ricco Jonas relies, courts have concluded that "[t]he service of a federal subpoena on an employee of an entity [that is protected by sovereign immunity]," such as the State of New Hampshire, "is neither a suit, nor one against [the entity]." United States v. Juvenile Male 1, 431 F. Supp. 2d 1012, 1016 (D. Az. 2006); see

- 16 -

also Allen v. Woodford, 544 F. Supp. 2d 1074, 1078-79 (E.D. Cal. 2008) (holding that the issuance and required compliance with discovery subpoenas directed to custodians of records of state agencies under the Federal Rules of Civil Procedure did not constitute a "suit in law or equity" within the meaning of the Eleventh Amendment); Juvenile Male 1, 431 F. Supp. 2d at 1016 (holding in a proceeding to enforce a subpoena duces tecum issued under Rule 17(b) and (c) of the Federal Rules of Criminal Procedure that "sovereign immunity from suit [lacks] any application to the enforcement of a federal subpoena on the custodian of records of a state or federal agency"). Some courts have reasoned that an enforcement proceeding seeking to compel a state officer to comply with a subpoena for state records that may only be obtained through the state's custodian of records does not constitute a suit against the state because such proceeding does not assert a claim in law or equity against the state or its officer. See, e.g., Allen, 544 F. Supp. 2d at 1079. "No judgment will be issued . . . against the State that could have any conceivable effect on the State treasury; the State custodian[] [is] only subpoenaed to produce documents for use in [a litigation not involving the State or the State custodian]." Id. We find this reasoning persuasive. Here, the enforcement proceeding does not involve a claim in law or equity against the State of New Hampshire. Nor will a judgment be issued against the State that could have a conceivable effect on

New Hampshire's treasury.  The relief sought by the DEA through this enforcement proceeding is merely an order for Ricco Jonas to produce records to be used by the DEA in its investigation of violations involving controlled substances and only she, not the State, may be found to be in contempt of court for failing to comply with a court order enforcing the subpoena.

Although Ricco Jonas complains that the cases cited herein involved discovery subpoenas issued under other statutory provisions to obtain documents for pending litigation, she fails to meaningfully discuss, and we fail to see, why such distinction should lead to a different conclusion in this case.[8]  After all, an administrative subpoena "amount[s] to no more than a simple direction to produce documents, subject to judicial review and enforcement."  Sturm, Ruger & Co., 84 F.3d at 3 (citing, among other authority, Okl. Press Pub. Co. v. Walling, 327 U.S. 186, 195 (1946)).  And a proceeding to enforce an administrative subpoena, such as the one established in 21 U.S.C. § 876(c), is "a 'satellite' proceeding . . . designed only to facilitate the [federal agency's] investigation," McLane Co., 137 S. Ct. at 1168, by allowing the agency to use "one of the tools" that Congress

_____

    [8]  Nor does she explain why the logic of the cases cited should not control merely because, in her view, this case involves an issue "of statutory interpretation, not Eleventh Amendment immunity," especially when she herself relied on sovereign immunity principles in making her arguments.

placed "at its disposal in conducting its investigation[s]." Id. at 1164.

In light of the above, we are unpersuaded by Ricco Jonas's arguments that New Hampshire was the instant subpoena's true target and that this enforcement proceeding constitutes a suit against the State. Furthermore, even if we were to find that the subpoena was really issued to the State, Ricco Jonas's challenge would still fail because as explained below, states, their agencies, and their officials in their official capacities are "persons" within the meaning of 21 U.S.C. § 876(c) against whom subpoenas may be enforced.

## B. Statutory Construction of 21 U.S.C. § 876

The parties dispute whether 21 U.S.C. § 876(a) authorizes the Attorney General to issue administrative subpoenas to states and to enforce them under § 876(c). Because this is an issue of statutory construction, we turn to the language of the statute. See In re Fin. Oversight & Mgmt. Bd. for P.R., 919 F.3d 121, 128 (1st Cir. 2019) ("[I]n resolving a dispute over the meaning of a statute we begin with the language of the statute itself." (citing Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985))).

The Attorney General's subpoena power derives from § 876(a) of the CSA. Congress used very broad language in that section: "In any investigation relating to . . . controlled

- 19 -

substances, . . . the Attorney General may . . . require the production of <u>any records</u> . . . which [he] finds relevant or material to the investigation. . . . <u>from any place</u> in any State." 21 U.S.C. § 876(a) (emphasis added). Ricco Jonas urges us to find that, despite this broad language, the Attorney General's subpoena authority is limited by § 876(c), which provides that "[i]n the case of contumacy by or refusal to obey a subp[o]ena issued to any person, the Attorney General may invoke the aid of [federal courts]." <u>Id.</u> § 876(c). According to Ricco Jonas, because the CSA does not define "person," we must presume that such term does not include the sovereign, and construe § 876(a) consistent with such limitation. She further argues that "the text, structure, purpose, legislative history, and executive interpretation" of the CSA all lead to the conclusion that states, their agencies, and their officials are not "'persons' who may be targeted and commanded to comply with administrative investigatory subpoenas."

In the absence of an express statutory definition, we apply a "longstanding interpretative presumption that 'person' does not include the sovereign."[9] <u>Return Mail, Inc.</u> v. <u>USPS</u>, 139

---

[9] This presumption both "reflects 'common usage'" and is "an express directive from Congress," which has set forth in the Dictionary Act that, unless context indicates otherwise, "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." <u>Return Mail, Inc.</u> v. <u>USPS</u>, 139 S. Ct. 1853, 1862 (2019) (first quoting <u>United States</u> v. <u>Mine Workers</u>, 330 U.S. 258, 275 (1947); and then quoting 1 U.S.C. § 1).

S. Ct. 1853, 1861-62 (2019) (quoting Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 780-81 (2000)). This presumption, however, "is not a 'hard and fast rule of exclusion'" and "may be disregarded upon some affirmative showing of statutory intent to the contrary." Id. at 1862 (first quoting United States v. Cooper Corp., 312 U.S. 600, 604-05 (1941); and then quoting Stevens, 529 U.S. at 781); see also Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 83 (1991) ("[O]ur conventional reading of 'person' may . . . be disregarded if '[t]he purpose, the subject matter, the context, the legislative history, [or] the executive interpretation of the statute . . . indicate an intent, by the use of the term, to bring state or nation within the scope of the law.'") (first and second alterations ours).

Ricco Jonas's contention that the Attorney General's authority conferred in § 876(a) is limited by § 876(c) is not the most natural reading of the statute. Furthermore, the purpose of 21 U.S.C. § 876, its context, and its legislative history all point to the conclusion that Congress intended to bring states within the scope of the Attorney General's subpoena power under § 876(a) and subject to § 876(c)'s judicial enforcement provision.

Prior to the enactment of the Act in 1970, "most domestic drug regulations . . . generally came in the guise of revenue laws, with the Department of the Treasury serving as the Federal

Government's primary enforcer".[10]  Raich, 545 U.S. at 10.  Before 1955, the Secretary of Treasury had no authority to subpoena witnesses or to require the production of records with respect to the enforcement of federal laws relating to narcotic drugs.  H.R. Rep. No. 84-1247 (1955); H.R. Rep. No. 84-1347 (1955).  At the time, it was "necessary for the enforcement officers of the Treasury Department to obtain subp[o]enas through the Federal courts upon a showing of sufficient evidence to justify the issuance of the subp[o]enas."  H.R. Rep. No. 1247; H.R. Rep. No. 84-1347.  Congress believed that "[t]his lack of authority handicap[ped] enforcement officers of the Treasury Department." 101 Cong. Rec. 11,683 (1955) (remarks of Rep. Cooper).  Because Congress was of the view that "the power to subpoena witnesses, and to require the production of records [would be] a legitimate and effective aide to the administration of regulatory and penal statutes," H.R. Rep. No. 1347, on August 11, 1955, it passed Public Law 362.  See Act of Aug. 11, 1955, ch. 800, Pub. L. No. 84-362, 69 Stat. 684, codified as 21 U.S.C. §§ 198a-198c.

---

[10]  Congress eventually "shifted the constitutional basis for drug control from its taxing authority to its power to regulate interstate commerce, and in 1968 [narcotic enforcement] was transferred to [the Department of Justice]." Lisa N. Sacco, Cong. Research Serv., R43749, Drug Enforcement in the United States: History, Policy, and Trends 5 (2014), available at https://sgp.fas.org/crs/misc/R43749.pdf (last visited Jan. 27, 2021).

Public Law 362 authorized the Secretary of the Treasury "to . . . subp[o]ena witnesses . . . and require the production of <u>any records</u> (including books, papers, documents, and tangible things which constitute or contain evidence) which [he deemed] relevant or material to [an] investigation [in connection with the enforcement of narcotic drugs and marihuana laws]." Pub. L. No. 362, § 1 (authorizing subpoenas in connection with the enforcement of narcotic laws) (emphasis added). Under this provision, records were subject to the subpoena authority of the Secretary of Treasury as long as he deemed them relevant or material to an investigation relating to narcotic drugs or marihuana laws, regardless of who the records belonged to or who was their custodian. <u>See</u> 101 Cong. Rec. 11,683 (remarks of Rep. Jenkins summarizing that the House bill would authorize the Secretary of the Treasury to subpoena "any records" which the Secretary found "necessary or relevant to an investigation in connection with the enforcement of laws pertaining to narcotic drugs and marihuana"). The bill included an enforcement mechanism that allowed the Secretary of the Treasury to invoke the aid of federal courts "[i]n case of contumacy by, or refusal to obey a subp[o]ena issued to[] any person." Pub. L. No. 362, § 3. As explained in the Congressional Record, the intent was to "establish a contempt procedure as a means of compelling compliance with <u>any</u> summons issued pursuant to the authority granted [under the statute]." 101 Cong. Rec. 11,683 (remarks of

- 23 -

Rep. Cooper) (emphasis added); see also S. Rep. No. 1247 (explaining that the bill included a provision establishing "a contempt procedure before Federal district judges as a means of compelling compliance with any summons issued" under the statute); H.R. Rep. No. 84-1347 (same). Congress sought to provide the Secretary of the Treasury with "an invaluable weapon in the enforcement of the laws relating to narcotic drugs and marihuana." S. Rep. No. 1247; H.R. Rep. No. 84-1347; see also United States v. Pardo-Bolland, 348 F.2d 316, 321 (2d Cir. 1965) (noting "[t]he ease with which the Secretary of the Treasury [could] legally authorize the issuance of a subpoena in furtherance of a narcotics investigation").

Public Law 362 was § 876's predecessor. The statutory language of § 876 is identical in all relevant parts to that of Public Law 362. Congress's grant of authority to the Attorney General in § 876(a) is as broad as that of its predecessor, and its plain language allows for the subpoena of "any records" in "any investigation" relating to controlled substances as long as the Attorney General finds the records relevant or material to the investigation and such records are located in any State, territory, or within the jurisdiction of the United States. 21 U.S.C. § 876(a). See United States v. Mountain States Tel. & Tel. Co., 516 F. Supp. 225, 230 (D. Wyo. 1981) (stating that the subpoena powers under § 876 and Public Law 362 are coterminous); see also United

- 24 -

States v. Moffett, 84 F.3d 1291, 1293 (10th Cir. 1996) (stating that 21 U.S.C. § 876(a) "is written to give the DEA broad powers to investigate violations of federal drug laws").

Ricco Jonas does not contest that the statutory language authorizing the Attorney General to issue administrative subpoenas under § 876(a) is broad or that its plain language does not limit law enforcement's authority to obtain records relevant to its investigations based on who holds such records. She posits, however, that we must read § 876(a)'s language in tandem with § 876(c) which, in her view, limits the Attorney General's authority. But Ricco Jonas's proposed reading is not consistent with Congress's intent as revealed in the legislative history of Public Law 362. The legislative history reveals that § 876(c) was not meant to limit or otherwise hamper the broad authority granted to the Attorney General under § 876(a). Instead, § 876(c) was meant to give teeth to the Attorney General's authority by providing a mechanism to enforce subpoenas issued under § 876(a). And contrary to Ricco Jonas's contention, the legislative history leads to the conclusion that the scope of § 876(c) is informed by the authority granted in § 876(a), not the other way around. See 101 Cong. Rec. 11683 (remarks of Rep. Cooper noting that the enforcement mechanism was meant to "compel[] compliance with any summons issued pursuant to the authority granted").

- 25 -

It is clear that Congress's intention was to facilitate law enforcement investigations so that the goals of the CSA -- "to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances," Raich, 545 U.S. at 12 -- could be accomplished. See United States v. Zadeh, 820 F.3d 746, 752 (5th Cir. 2016) (noting that because "[f]ederal control" is "essential to the effective control of the interstate incidents of . . . traffic in controlled substances," the CSA "grants the DEA broad enforcement power to prevent, detect, and investigate" drug diversion into illegal channels) (alterations in original). To interpret § 876 in a way that restricts law enforcement's authority to request records relevant to their investigations from states -- who customarily maintain records of all controlled substances distributed in their jurisdictions -- would not only run afoul of the statutorily conferred broad authority, but would also be contrary to Congress's intent by significantly reverting law enforcement's investigation capabilities to its pre-1955 situation. Because the language of § 876 of the CSA is identical in all relevant respects to that of Public Law 362 and the CSA is part of a comprehensive statute that sought to "enhance federal drug enforcement powers" and "strengthen law enforcement tools against the traffic in illicit drugs," Raich, 545 U.S. at 10, 12 (emphasis added), it is clear that Congress could not have intended to revert law enforcement's investigation capabilities to its pre-

1955 situation. See United Sates v. Hossbach, 518 F. Supp. 759, 767 (E.D. Pa. 1980) (noting that "[e]ven though [the grant of subpoena power under 21 U.S.C. § 876] may be broader than that customarily granted to agencies by Congress, the preamble to the statute as to Congressional findings and declarations, 21 U.S.C. § 801, makes clear that it was of grave concern to Congress that there should be effective methods of dealing with illegal drug manufacturing and distribution").

Ricco Jonas argues that the CSA "uses the terms 'person' and 'State' throughout its statutory text differently" which, in her view, indicates that the term "person" contained in 21 U.S.C. § 876(c) does not include the State, its agencies, or its officials in their official capacities. As an example, she cites 21 U.S.C. § 873, a provision requiring the Attorney General to "cooperate with local, State, tribal, and Federal agencies concerning traffic in controlled substances." But that the CSA uses the more specific term "State" in some of its provisions for a more precise and coherent language does not mean that "State" cannot also be included within the meaning of "person" when such term is used in a way that encompasses several different terms, as used in § 876(c).[11] In fact, just like the CSA uses "State" as a less

_____

[11] Moreover, a single statutory term may even "take[] on 'distinct characters' in distinct statutory provisions" throughout a statute. Return Mail, Inc., 139 S. Ct. at 1863 (quoting Utility Air Regulatory Grp. v. EPA, 573 U.S. 302, 320 (2014).

inclusive and more precise term than "person" in some provisions, it also uses the less inclusive and more precise term "individuals" in its text. See, e.g., 21 U.S.C. § 823(g)(1) (establishing that practitioners who dispense narcotic drugs to "individuals" for maintenance or detoxification treatments shall obtain a separate registration for that purpose). Yet, Ricco Jonas does not dispute that despite the CSA's use of "individuals" throughout its statutory text differently from "person," the term "person" contained in 21 U.S.C. § 876(c) includes "individuals."[12]

Next, Ricco Jonas posits that the CSA contemplates "cooperative arrangements" between the federal government and states, see id. § 873, "not relationships where records will be seized via administrative investigatory subpoena." But that Congress envisioned cooperation between the federal government and states does not mean that it intended the Attorney General/DEA to hopelessly rely on the states' willingness to cooperate in order to obtain needed information to perform their congressionally assigned investigative function. Legislative history makes clear that Congress intended to "strengthen law enforcement tools," Raich, 545 U.S. at 10, so that "[t]he illegal traffic in drugs

---

[12] Ricco Jonas urges us to adopt the Dictionary Act's definition of "person," which includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." See 1 U.S.C. § 1 (emphasis added).

[c]ould be attacked with the <u>full power</u> of the Federal Government," H.R. Rep. No. 91-1444, at 4575 (1970) (emphasis added), not that law enforcement be at the mercy of the states' willingness to cooperate.  This very case exemplifies why it was important for Congress to provide the Attorney General/DEA with a mechanism to obtain records relevant to their investigations from states, its agencies, and its officials.

Furthermore, contrary to Ricco Jonas's contentions, providing the Attorney General/DEA with a mechanism to enforce subpoenas does not render the cooperative arrangements provision meaningless.  Section 873 of the CSA, titled "Cooperative Arrangements," states that, "[t]he Attorney General shall cooperate with local, State, tribal, and Federal agencies concerning traffic in controlled substances and in suppressing the abuse of controlled substances."  21 U.S.C. § 873(a).  To this end, the Attorney General "is authorized to . . . assist State, tribal, and local governments in suppressing the diversion of controlled substances from legitimate medical, scientific, and commercial channels."  <u>Id.</u> § 873(a)(6).  That the Attorney General/DEA may enforce administrative subpoenas issued to states, their agencies, or officials under § 876(c) for records relevant to their own investigations relating to controlled substances in no way hampers the Attorney General's authorization under § 873 to assist local, state, tribal, and federal agencies in their own

- 29 -

fights against the illicit traffic of controlled substances. Nor does it hamper, as Ricco Jonas contends, the states' prerogative to conduct their own investigations and prosecute drug offenses pursuant to applicable state laws.

Finally, we note that our interpretation is consistent with the federal agency's interpretation of its statutory authority to issue administrative subpoenas for records relevant to its investigations, and, for aught that it appears, this is the first time that a state has challenged this interpretation in court in the more than six decades that such authority has been in place.[13] See, e.g., Or. Prescription Drug Monitoring Program v. U.S. DEA, 860 F.3d 1228, 1236 (9th Cir. 2017) (stating, where the DEA issued an administrative subpoena under § 876(a) to seek records from Oregon's Prescription Drug Monitoring Program -- a state-maintained database like the PDMP -- that "[t]he upshot of the statutory scheme is that the Attorney General can obtain testimony and documents through a subpoena and without a court order" and that "[a] court order is needed only in the event of noncompliance ('contumacy . . . or refusal to obey') with the subpoena" (third alteration in original) (citing 21 U.S.C. §§ 876(a) and (c))); see also Return Mail, Inc., 139 S. Ct. at

---

[13] The parties have not pointed us to any case addressing the statutory construction question presented here, nor has our independent research revealed such a case.

1866 (stating that "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well" (quoting Bragdon v. Abbott, 524 U.S. 624, 645 (1998)).

In light of the above, we find that the instant subpoena is a legitimate exercise of authority under the CSA. Hence, the district court did not abuse its discretion in concluding that it was enforceable under 21 U.S.C. § 876(c).[14]

## C.    The Privacy Interest in PDMP Data

Ricco Jonas argues that, even if 21 U.S.C. § 876 authorizes the issuance and enforcement of administrative subpoenas against states, their agencies, and officials in their official capacities, the Fourth Amendment nonetheless bars the enforcement of the instant subpoena. According to Ricco Jonas, individuals have a reasonable expectation of privacy in their prescription drug records stored in the PDMP database, thereby allowing the DEA to obtain such records only with a court order based on probable cause.

---

[14] On appeal, Ricco Jonas does not challenge the district court's conclusion that the CSA preempts New Hampshire's statutory requirement that law enforcement officials obtain an order based on probable cause before obtaining PDMP data. Hence, we do not address that issue.

- 31 -

The parties dispute whether Ricco Jonas has standing to assert the substantive Fourth Amendment rights of the individual patient subject to the subpoena. The district court assumed without deciding that Ricco Jonas had standing. On appeal, Ricco Jonas and Amici argue in favor of standing, relying on the parens patriae doctrine and third-party standing, respectively. For its part, the DOJ argues that Fourth Amendment rights may not be invoked vicariously. Because this is an issue of prudential constraint, rather than Article III standing, we bypass the issue and directly address the merits of the case. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125 (2014) (explaining that the "'prudential' branch of standing," which is "not derived from Article III," includes "the general prohibition on a litigant's raising another person's legal rights" (quoting Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 12 (2004)); Warth v. Seldin, 422 U.S. 490, 509 (1975) (noting that the prudential standing rule "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves"); Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012) (explaining that prudential concerns "ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked"

- 32 -

(quoting Pagán v. Calderón, 448 F.3d 16, 27 (1st Cir. 2006)); see also Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 638 (1st Cir. 2013) (bypassing the prudential standing issue "in favor of a more straightforward resolution on the merits").

The Fourth Amendment applies when the person invoking its protection has a reasonable expectation of privacy in the place to be searched or the item to be seized by governmental officials. Smith v. Maryland, 442 U.S. 735, 739-40 (1979); United States v. Battle, 637 F.3d 44, 48 (1st Cir. 2011). The Supreme Court has established a "two-part test" for analyzing whether a movant has a reasonable expectation of privacy under the Fourth Amendment. United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009). Under this test, we must determine "first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." Id. (citing Smith, 442 U.S. at 740). Absent such an expectation, the government may use a subpoena to acquire records in its investigation without the need of a court order based on probable cause. See Carpenter v. United States, 138 S. Ct. 2206, 2222 (2018) ("The Government will be able to use subpoenas to acquire records in the overwhelming majority of investigations. . . . [A] warrant is required in the rare case where the suspect has a legitimate privacy interest in records held by a third party.").

The DOJ argues that, contrary to Ricco Jonas's contentions, "because of the closely regulated nature of the pharmaceutical industry and the third-party doctrine, a person cannot claim an objectively reasonable expectation of privacy" in his prescription drug records included in the PDMP database.[15] We agree.

The closely regulated industry doctrine recognizes that there is a diminished expectation of privacy for materials that are maintained by a business that is subject to pervasive regulation and inspection.[16] See Donovan v. Dewey, 452 U.S. 594, 600 (1981) (explaining that in a pervasively regulated business "the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes"); New York v. Burger, 482 U.S. 691, 702 (1987) (explaining that "[b]ecause the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy," administrative searches and warrantless inspections "may well be reasonable within the meaning

_____

[15] The DOJ notes that, because the individual whose prescription records are being sought was not before the district court, it is impossible to determine whether such individual claims a privacy interest in those records. The DOJ thus focuses its argument on the objective part of the test.

[16] Case law uses the terms "closely regulated," "highly regulated," and "pervasively regulated" interchangeably.

of the Fourth Amendment"); <u>Giragosian</u> v. <u>Bettencourt</u>, 614 F.3d 25, 29 (1st Cir. 2010) (validating the government's warrantless search of a licensed firearm dealer's inventory and records because "the owner of commercial property in a closely regulated industry has a reduced expectation of privacy in those premises"). This court, as well as others, has characterized the pharmaceutical industry as a closely regulated industry. <u>United States</u> v. <u>Gonsalves</u>, 435 F.3d 64, 67 (1st Cir. 2006); <u>see</u> <u>also</u> <u>United States</u> v. <u>Schiffman</u>, 572 F.2d 1137, 1142 (5th Cir. 1978) ("The pharmaceutical industry is a 'pervasively regulated business' like the liquor and gun industries." (quoting <u>United States</u> v. <u>Montrom</u>, 345 F. Supp. 1337, 1340 (E.D. Pa. 1972))); <u>United States</u> v. <u>Acklen</u>, 690 F.2d 70, 75 (6th Cir. 1982) (holding that "the pharmaceutical industry, like the mining, firearms, and liquor industries, is a pervasively regulated industry and that consequently pharmacists and distributors subject to the Controlled Substances Act have a reduced expectation of privacy in the records kept in compliance with the Act") (footnotes omitted); <u>United States</u> v. <u>Nechy</u>, 827 F.2d 1161, 1166 (7th Cir. 1987); <u>United States</u> v. <u>Motley</u>, 443 F. Supp. 3d 1203, 1213 (D. Nev. 2020) (noting that the prescription drug industry is highly regulated); <u>U.S. Dep't of Justice</u> v. <u>Utah Dep't of Commerce</u>, No. 2:16-cv-611-DN-DBP, 2017 WL 3189868, at *8 (D. Utah July 27, 2017) (stating that "[p]rescription drugs are a highly regulated industry"); <u>State</u> v. <u>Welch</u>, 624 A.2d 1105, 1110-

11 (Vt. 1992); Stone v. Stow, 593 N.E.2d 294, 300 (Ohio 1992) ("Being in such a pervasively regulated business, a pharmacist has a reduced expectation of privacy in the prescription records he or she keeps.").

Both federal and New Hampshire laws regulate controlled substances by requiring pharmacies, among other handlers of controlled substances, to maintain prescription drug records and keep them open for inspection by law enforcement officers without the need of a warrant.

The CSA and its implementing regulations provide that every registered dispenser of a controlled substance must maintain a complete and accurate record of each such substance disposed of.[17] 21 U.S.C. § 827(a)(3); 21 C.F.R. §§ 1304.03, 1304.04(h), 1304.21(a). These records must be kept for at least two years "for inspection and copying by officers or employees of the United States authorized by the Attorney General." 21 U.S.C. § 827(b); see also 21 C.F.R. § 1304.04(a) (establishing that all required records concerning controlled substances must be maintained for at least two years for inspection and copying by duly authorized DEA officials).

---

[17] The records of controlled substances maintained by registered pharmacies shall include paper prescription records and electronic prescription records, which must be sortable by prescriber name, patient name, drug dispensed, and date filled. 21 C.F.R. § 1304.04(h).

- 36 -

Similarly, New Hampshire law requires practitioners, including pharmacists, physicians, and hospitals, to maintain records "show[ing] the receipt and disposition of all controlled drugs." N.H. Rev. Stat. Ann. § 318-B:12(I). These records must comply with "federal laws and regulations" and must indicate at least: (1) the name, dosage form, strength, and quantity of the controlled drug; (2) the name and address of any person to whom the drug was administered, dispensed, sold or transferred; and (3) the date of any and all transactions involved with the controlled drug. Id. Practitioners shall keep these records "open for inspection . . . to federal, state, county and municipal law enforcement officers [and others] . . . whose duty it is to enforce the laws of [New Hampshire] or of the United States relating to controlled drugs." Id. § 318-B:12(II).

Pursuant to New Hampshire law, every person or entity authorized to deliver schedule II-IV controlled substances must also report to the PDMP information about the dispensed drug, including the patient's name and address, the drug and quantity dispensed, and the date of dispensing. Id. §§ 126-A:89(VI), 126-A:91(VI)(a)-(o).

Ricco Jonas contends that, despite the closely regulated nature of the pharmaceutical industry and the availability of prescription drug records to law enforcement without a court order under both federal and state law, we should nevertheless find a

- 37 -

reasonable expectation of privacy in prescription drug records because several courts have recognized that patients have a reasonable expectation of privacy in their medical records.[18] We reject Ricco Jonas's invitation to equate prescription drug records to all other medical records. As a subset of medical records, prescription drug records do not generally or necessarily contain the more personal and intimate information that other medical records do. Medical records contain "sensitive medical history and other information, including about mental illnesses, learning disabilities, birth defects, illicit drug use, pregnancy terminations, domestic-violence history," patients' complaints and symptoms, and "the patients' family members," among others. Eil v. U.S. DEA, 878 F.3d 392, 396 (1st Cir. 2017). Furthermore, unlike prescription drug records, medical records are not subject to pervasive regulatory disclosures under both federal and state

---

[18] In support of this argument, Ricco Jonas cites Ferguson v. City of Charleston, 532 U.S. 67 (2001). But Ferguson was not about access to prescription drug records held by a third-party. Rather, there, the hospital, in conjunction with law enforcement, developed and followed a policy for identifying and testing pregnant patients suspected of drug use. Under that policy, the hospital would take urine tests of pregnant women and provide positive results to the police. Ferguson, 532 U.S. at 70-73. The Supreme Court held that the hospital's performance of a diagnostic test to obtain incriminating evidence from their patients for law enforcement purposes without the patients' consent was unconstitutional. Id. at 83-84. The Court noted that its ruling did not extend to a situation "in which state hospital employees, like other citizens, may have a duty to provide law enforcement officials with evidence of criminal conduct acquired in the course of routine treatment." Id. at 78 n.13.

law.  See U.S. Dep't of Justice v. Utah Dep't of Commerce, No. 16-cv-00611-DN-DBP, 2017 WL 9131888, at *4 (D. Utah Mar. 10, 2017) (Pead, Mag.J.) (stating that "the applicable legal framework suggests prescription drug records are highly regulated, and thus less deserving of privacy [than medical records]").

Ricco Jonas also argues that individuals have a reasonable expectation of privacy in their prescription drug records stored in the PDMP database because "prescription drug records are frequently suggestive of patients' underlying medical diagnoses."  But her argument crumbles in the face of the pharmaceutical industry's regulatory requirements.  Both New Hampshire and federal law require that practitioners and handlers of controlled substances (including pharmacies and pharmacists) maintain records containing essentially the same information stored in the PDMP database and keep such records available for law enforcement inspection without the need of a court order.  The PDMP merely aggregates into one depository the information included in records that must already be maintained available and open for inspection by the DEA.  Ricco Jonas does not discuss why we should find a reasonable expectation of privacy in the aggregated database records when the underlying individual records containing essentially the same information are open to on-site inspection by law enforcement.  And case law suggests we should not.  See Whalen v. Roe, 429 U.S. 589, 600-04 (1977) (holding that

New York's collection of prescription records in a computerized database did not violate patients' and physicians' right to privacy under the Due Process Clause of the Fourteenth Amendment).

We thus find that, in light of the intense government scrutiny to which prescription drug records are subject and the availability of those records for inspection without the need of court intervention under both state and federal law, a person does not have a reasonable expectation that the information contained in prescription drug records will be kept private and free of government intrusion. See Motley, 443 F. Supp. 3d at 1213 (reasoning that, because the pharmaceutical industry is highly regulated and "is required by federal law to keep the types of records sought by [law enforcement] in [that] case, [defendant] did not have a reasonable expectation of privacy in the [Prescription Monitoring Program] database"); Utah Dep't of Commerce, 2017 WL 3189868, at *8-9 (holding that, because "patients do not have a reasonable expectation of privacy in the highly regulated prescription drug industry," the Fourth Amendment posed no bar to enforcement of subpoena issued by the DEA to obtain records from the state-maintained database); Murphy v. State, 62 P.3d 533, 541 (Wash. Ct. App. 2003) ("Given [the] long history of government scrutiny, patients who fill prescriptions for narcotic drugs . . . should reasonably expect that their prescriptions will be available to appropriate government agents."). In fact, the

expectation created by the intense regulatory requirements is that "prescription and use of controlled substances will happen under the watchful eye of [both] the federal [and state] government[s]." Utah Dep't of Commerce, 2017 WL 3189868, at *8.

Our conclusion that patients do not have a reasonable expectation of privacy in their prescription drug records is further supported by the third-party doctrine. Under that doctrine,

> a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties . . . even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Morel, 922 F.3d 1, 8-9 (1st Cir. 2019) (citing Smith, 442 U.S. at 743-44) (quotation marks omitted).

This doctrine "largely traces its roots to [United States v. Miller, 425 U.S. 435 (1976)]." Carpenter, 138 S. Ct. at 2216. In Miller, the Supreme Court applied the third-party doctrine in rejecting a bank customer's claim of a reasonable expectation of privacy in his financial records held by the bank. Miller, 425 U.S. at 436-45. The Court noted that the records subpoenaed were business records and not Miller's "private papers" and that they contained information "exposed to [bank] employees in the ordinary course of business." Id. at 440, 442. The Court thus concluded that Miller had "take[n] the risk, in revealing his

- 41 -

affairs to another, that the information [would] be conveyed by that person to the Government." Id. at 443. The Court applied the same logic to dialed phone numbers in Smith v. Maryland, where it held that, "[w]hen he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed." 442 U.S. at 744.

Ricco Jonas, however, resists the application of the third-party doctrine. Relying on Carpenter v. United States, 138 S. Ct. 2206 (2018), where the Supreme Court declined to extend the third-party doctrine to cell-site location information, Ricco Jonas claims that such doctrine is not applicable here because patients do not turn over prescription records voluntarily inasmuch as the only way to avoid such sharing is by forgoing medical treatment or filling their prescriptions in another state.

But Carpenter is of no help to Ricco Jonas. Carpenter did not disturb the third-party doctrine. Carpenter, 138 S. Ct. at 2220 ("We do not disturb the application of Smith and Miller."). Rather, it reiterated that two primary rationales underlie the third-party doctrine: the nature of the information sought and the voluntariness of the exposure of that information to third parties. Id. at 2219-20. Based on these rationales, the Court

refused to apply the third-party doctrine in that case because doing so would amount to "a significant extension of [the doctrine] to a distinct category of information." Id. at 2219.

In considering the nature of the information sought, the Supreme Court noted in Carpenter that cell-site location information provides an "all-encompassing record of the [cell phone] holder's whereabouts[,] . . . revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" Id. at 2217 (quoting United States v. Jones, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)). In essence, it amounts to a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years." Id. at 2220. In the Court's view, because the personal information that law enforcement can get from cell-site records is not limited like the information at issue in Miller and Smith, it "implicates privacy concerns far beyond those considered in [those two cases]." Id.

Here, Ricco Jonas argues that prescription drug records contain intimate and private details because it may be possible to determine a person's illnesses from looking at such records, thus suggesting that the nature of the documents sought should cut against applying the third-party doctrine. But the nature of prescription drug records is similar to that of bank records, and much different than that at issue in Carpenter. See id. at 2219

- 43 -

("There is a world of difference between the limited types of personal information addressed in Smith and Miller and the exhaustive chronicle location information casually collected by wireless carriers today."). Even though financial transactions can reveal personal information, such as "personal affairs, opinions, habits," "a person's activities, associations, and beliefs," Miller, 425 U.S. at 451, 453 (Brennan, J., dissenting), the Supreme Court characterized this type of personal information as "limited." Carpenter, 138 S. Ct. at 2219. The personal information that law enforcement could get from prescription drug records is likewise limited. At most, law enforcement could possibly decipher a patient's diagnosis or several potential diagnoses. This is thus more akin to the information at issue in Miller than to the "all-encompassing record" and "detailed chronicle" that may be ascertained from cell-site records. Id. at 2217, 2220. Furthermore, the records subpoenaed by the DEA are not the patient's "private papers." Miller, 425 U.S. at 440. A physician does not write a prescription for the patient to keep to himself. Instead, the prescription is meant to be turned over to a drug dispenser in the ordinary course of business with instructions of what drug, what dosage and frequency, and to whom the controlled substance should be dispensed. See United States v. Gayden, 977 F.3d 1146, 1152 (11th Cir. 2020) (finding that disclosure of prescription drug records was voluntary because

prescriptions "were, by their very nature, intended to be revealed to others when they were disclosed . . . to the pharmacies which filled them"). Prescription drug records are kept by the pharmacy or dispensary and subsequently shared with the PDMP, and the patient has no access to those records or control over them.

Nor does the second rationale underlying the third-party doctrine -- voluntary exposure -- help Ricco Jonas. In Carpenter, the Supreme Court noted that

> a cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up. Virtually any activity on the phone generates [cell-site location information] . . . . [and] [a]part from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data.

Carpenter, 138 S. Ct. at 2220. Ricco Jonas argues that, like the cell phone user in Carpenter, patients do not voluntarily share their prescription drug information with third parties. She submits that obtaining health care and drug treatment therapies is "indispensable to participation in modern society" and apart from forgoing health care and drug treatment therapies, there is no way to avoid leaving behind prescription drug data. Thus, in her view, in no meaningful sense does a patient voluntarily assume the risk of turning over prescription drug data. But the Supreme Court rejected a similar argument in Miller. There, Miller argued that "[f]or all practical purposes, the disclosure by individuals or business firms of their financial affairs to a bank is not entirely

volitional, since it is impossible to participate in the economic life of contemporary society without maintaining a bank account." Brief for Respondent, United States v. Miller, 425 U.S. 435 (1976) (No. 74-1179), 1975 WL 173642, at *8; see also Miller, 425 U.S. at 451 (Brennan, J., dissenting) (adopting this argument). Unpersuaded, the Court found that this does not change the fact that the person affirmatively elected to turn over the document to a third party and, in so doing, "t[ook] the risk" that the information be conveyed by that third party to the government. Miller, 425 U.S. at 443. Similarly, a person who turns over his prescription for controlled substances to a third party "assume[s] the risk" (in this case the certainty, given the state and federal disclosure requirements), that the information be turned over to the government. Carpenter, 138 S. Ct. at 2220.

In sum, an analysis of the two rationales underlying the third-party doctrine lead us to conclude that the third-party doctrine applies to this case. See Gayden, 977 F.3d at 1152 (holding that "prescription records are third-party material" that may be obtained by law enforcement without a warrant). As the Court noted in Carpenter, "society's expectation has been that law enforcement agents . . . would not -- and indeed, in the main, simply could not -- secretly monitor and catalogue every single movement of an individual's car for a very long period." Carpenter, 138 S. Ct. at 2217 (quotation marks omitted). In the

Court's view, allowing the government to benefit from "seismic shifts in digital technology" that now makes possible the "tireless and absolute surveillance" of individuals "at practically no expense" would contravene that expectation. Id. at 2218-19.

Here, in contrast, there is no "powerful new tool," id. at 2223, that makes possible for law enforcement to now do what it could not do before. Although it may be easier and cheaper for law enforcement to obtain prescription drug records from the PDMP than from individual pharmacies, society's expectation has been for decades that law enforcement would have access to prescription drug records and would closely monitor the prescription and use of controlled substances.

Finally, Ricco Jonas argues that finding no reasonable expectation of privacy in prescription drug records may cause people to forgo treatment to maintain their privacy. But in Whalen the Supreme Court rejected a similar argument under the Fourteenth Amendment and Ricco Jonas offers no explanation for why the same reasoning should not apply under the Fourth Amendment. See Whalen, 429 U.S. at 602-04 (finding no invasion of privacy right protected by the Fourteenth Amendment despite the fact that "some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention" because of fear that public disclosure of this information "may reflect unfavorably on the[ir] character").

## IV. CONCLUSION

In light of the above, we hold that the district court did not abuse its discretion in enforcing the instant administrative subpoena. The district court's judgment is thus affirmed.