**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MYRON MOTLEY,

*Defendant-Appellant*.

No. 21-10296

D.C. Nos.
3:19-cr-00026-
LRH-WGC-1
3:19-cr-00026-
LRH-WGC

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued March 10, 2023
Submitted December 29, 2023
Las Vegas, Nevada

Filed December 29, 2023

Before: Susan P. Graber, Richard R. Clifton, and Mark J.
Bennett, Circuit Judges.

Opinion by Judge Bennett;
Concurrence by Judge Graber

# SUMMARY[*]

## Criminal Law

The panel affirmed (1) the district court's order denying Myron Motley's motion to suppress evidence obtained from two GPS tracking warrants, and (2) the district court's determination that a wiretap warrant was supported by probable cause and was necessary, in a case in which Motley was convicted and sentenced arising from his involvement in a conspiracy to distribute controlled substances— oxycodone and hydrocodone.

Given the government's long-standing and pervasive regulation of opioids, the panel held that Motley had no reasonable expectation of privacy in his opioid records maintained in Nevada's Prescription Monitoring Program database. Thus, Motley's Fourth Amendment challenge to the resulting tracking warrants fails. The panel therefore affirmed the order denying the suppression motion.

Concerning the wiretap determination, the panel wrote that the affidavit supporting the warrant application contained more than sufficient evidence establishing probable cause that Motley was engaged in a conspiracy to illegally distribute prescription opioids, and also contained sufficient information for the court to reasonably conclude that a wiretap was necessary to identify the full scope of the conspiracy.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel addressed Motley's remaining arguments in a concurrently filed memorandum disposition.

Judge Graber concurred in the part of the opinion that rejects Motley's challenges to the wiretap warrant, and concurred in the judgment. She did not join the part of the opinion that affirms the denial of the motion to suppress the evidence obtained as a result of the tracking warrants. She would uphold the denial of the motion to suppress on alternative grounds: the good-faith exception and harmlessness. She would not reach the substantial legal question of whether Motley had an objectively reasonable expectation of privacy in the identity and dosage of his prescription medications.

**COUNSEL**

Ellesse Henderson (argued) and Aarin Kevorkian, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Las Vegas Federal Public Defender's Office, Las Vegas, Nevada, for Defendant-Appellant.

Javier A. Sinha (argued), Attorney, Appellate Section, Criminal Division; Lisa H. Miller, Deputy Assistant Attorney General; Kenneth A. Polite, Jr., Assistant Attorney General; United States Department of Justice, Washington, D.C.; Robert L. Ellman, Assistant United States Attorney; Elizabeth O. White, Appellate Division Chief; Jason M. Frierson, United States Attorney; United States Attorney's Office, District of Nevada, Reno, Nevada; for Plaintiff-Appellee.

# OPINION

BENNETT, Circuit Judge:

Myron Motley appeals his conviction and sentence arising from his involvement in a conspiracy to distribute controlled substances—oxycodone and hydrocodone.  In this opinion we address two issues: (1) whether the district court properly denied Motley's motion to suppress evidence obtained from two tracking warrants because Motley had no reasonable expectation of privacy in his opioid prescription records maintained in Nevada's Prescription Monitoring Program ("PMP") database; and (2) whether the district court properly determined that the wiretap warrant was supported by probable cause and was necessary.[1]

We have jurisdiction under 28 U.S.C. § 1291.  Given the government's long-standing and pervasive regulation of opioids, we hold that Motley had no reasonable expectation of privacy in his opioid prescription records maintained in Nevada's PMP database.  Thus, there was no Fourth Amendment violation, and we affirm the district court's order denying suppression.  We also affirm the district court's determination that the wiretap warrant was supported by probable cause and was necessary.

---

[1] We address Motley's remaining arguments in a concurrently filed memorandum disposition.  For reasons explained in the separate disposition, we affirm Motley's conviction in full; we affirm in part and vacate in part the sentence; and we remand.

## I. BACKGROUND

### A. Nevada's PMP Database

Like in every other state,[2] Nevada operates an electronic database that tracks filled prescriptions for controlled substances. Nev. Rev. Stat. § 453.162 (2023). Nevada's database tracks drugs listed on Nevada's Schedules II–V. *Id.* Oxycodone is a Schedule II drug, and tramadol is a Schedule IV drug. Nev. Admin. Code § 453.520(2)(a) (2023); *id.* § 453.540(3) (2023). Both are opioids. *See United States v. Flores*, 725 F.3d 1028, 1032 n.2 (9th Cir. 2013) ("'Oxycodone' is a generic opioid pain reliever . . . ."); *Schedules of Controlled Substances: Placement of Tramadol Into Schedule IV*, 79 Fed. Reg. 37,623, 37,623 (July 2, 2014) ("Tramadol is a centrally acting opioid analgesic . . . .").

With exceptions not relevant here, pharmacies that dispense covered controlled substances must input certain information into Nevada's PMP database, such as the name and address of the individual prescribed the controlled substance, the prescribed controlled substance, the quantity dispensed, and the appropriate "ICD-10 Code" that identifies the diagnosis for which the substance was prescribed. Nev. Admin. Code § 639.926 (2023). Pharmacies must retain all prescriptions for at least two years, Nev. Rev. Stat. § 639.236(1) (2023), and keep all "[f]iles of prescriptions . . . open to inspection by members, inspectors and investigators of the [State] Board [of Pharmacy] and by inspectors of the Food and Drug Administration and agents

---

[2] "As of February 2018, 50 states, the District of Columbia, and two territories (Guam and Puerto Rico) had operational [prescription drug monitoring programs (PDMPs)] within their borders." Lisa N. Sacco et al., Cong. Rsch. Serv., R42593, *Prescription Drug Monitoring Programs* 4 (2018).

of the Investigation Division of the Department of Public Safety," *id.* § 639.236(3).

The Nevada Legislature has mandated that the PMP database be designed to, among other things, provide information on "[t]he inappropriate use by a patient of controlled substances listed in schedules II, III, IV or V to . . . appropriate state and local governmental agencies, including, without limitation, law enforcement agencies . . . , to prevent the improper or illegal use of those controlled substances." Nev. Rev. Stat. § 453.162(1)(a)(1). The state entities responsible for developing the PMP database "shall report any activity [they] reasonably suspect[] may . . . [i]ndicate . . . inappropriate activity related to the prescribing, dispensing or use of a controlled substance to the appropriate law enforcement agency . . . and provide the law enforcement agency . . . with the relevant information obtained from the program for further investigation." *Id.* § 453.164(3)(a) (2023); *see also id.* § 453.162(1). Certain law enforcement officers can access the PMP database without a warrant but only to "[i]nvestigate a crime related to prescription drugs" or to log information related to an investigation. *Id.* § 453.165(4) (2023).[3]

## B. Facts and Procedural History

### 1. First Tracking Warrant

In July 2018, law enforcement began investigating Motley because of information from a confidential

---

[3] Motley does not challenge the constitutionality of Nevada's laws establishing and governing the PMP database, and so we do not reach that question. Thus, the concurrence's concern with the constitutionality of Nevada's statute is irrelevant.

informant ("CI") who had proven reliable in a past, unrelated controlled purchase. The CI disclosed that Motley, who lives in California, regularly traveled to Reno, Nevada, to illegally obtain and sell prescription drugs.[4] As part of their investigation, law enforcement obtained a report from Nevada's PMP database that showed a certain physician had prescribed Motley opioids—oxycodone and tramadol—averaging 279 morphine milligram equivalent ("MME") per day over a several-year period. The amount prescribed suggested opioid abuse or diversion, as CDC guidance at the time recommended avoiding or carefully justifying an increase in dosage to greater than or equal to 90 MME per day.[5]

In September 2018, law enforcement filed in Nevada state court an application for a warrant to install a global positioning system ("GPS") tracking device on Motley's vehicle. The affidavit in support included the information from the CI as well as the PMP database information about Motley's opioid prescription history. The state court issued the search warrant, allowing law enforcement to place a tracking device on Motley's vehicle for ninety days.

---

[4] Specifically, an officer explained:

> The CI told me that [Motley] comes from California and meets with a physician . . . approximately every 30 days. [Motley] then meets this physician and the physician writes Motley a prescription for Oxycodone. In addition, the physician gives [Motley] a stack of prescriptions in other people's names for [Motley] to sell to those people.

[5] CDC, *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016* (Mar. 15, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

### 2. Second Tracking Warrant

In December 2018, after the first warrant expired, law enforcement sought a second tracking warrant in the United States District Court for the District of Nevada. The supporting affidavit repeated the information that supported the first warrant, including Motley's opioid prescription history obtained from the PMP database. The affidavit also explained that the PMP database records showed that Dr. Eric Math was the physician who wrote the prescriptions, and the affidavit included new information that law enforcement had obtained from the first tracking warrant. A magistrate judge issued the second warrant, and later renewed it, allowing law enforcement to install a tracking device on Motley's vehicle for a total of another ninety days.

### 3. Wiretap Warrant

Law enforcement later sought a wiretap warrant on Motley's cell phone under 18 U.S.C. § 2516. The 93-page affidavit reiterated the information contained in the two tracking warrant applications, including Motley's opioid prescription history obtained from the PMP database. The affidavit explained that other PMP database records showed that Dr. Math was also prescribing large amounts of opioids to coconspirators of Motley's. The affidavit included information establishing that Motley was well-acquainted and in frequent contact with those individuals. Some of this information was obtained through the GPS tracker on Motley's vehicle and his phone records.

The affidavit included information supporting law enforcement's contention that Motley was part of a drug trafficking organization. Information from several confidential sources (including the original CI) showed that Motley bought prescriptions for himself and others and then

sold the prescribed pills, including to another coconspirator, Michael Slater, who would resell the pills. Law enforcement observed Motley and his coconspirators engage in the following conduct "on multiple occasions": Motley and Joseph Jeannette traveled to a pharmacy where Jeannette obtained an item from the pharmacy. Afterward, Motley drove to Slater's apartment, and Motley and Slater appeared to conduct an exchange from Motley's vehicle. Law enforcement conducted several controlled buys: a confidential source bought oxycodone from Motley three times, and another confidential source bought oxycodone pills from Slater once.

The affidavit contained detailed reasons why a wiretap was necessary to achieve the goals of the investigation, including to identify the members and scope of the conspiracy. It explained that, although the confidential sources had provided useful information, they would probably be unable to obtain more details about the scope of the conspiracy without raising suspicion, given their limited relationships with Motley and Slater. The affidavit added that officers had evaluated other potential cooperators but ultimately determined that approaching such individuals would likely compromise the investigation.

The affidavit discussed the following investigative methods and explained, using case-specific details, why they would fail: more controlled purchases, undercover investigations, physical surveillance, search warrants, witness interviews, grand jury subpoenas, pole cameras, tracking warrants, GPS tracking warrants on cell phones,

telephone toll analysis, covert recording devices, trash searches, financial investigations, and mail covers.[6]

The district court granted the application for a wiretap on Motley's cell phone.

### 4. Relevant District Court Proceedings

A grand jury indicted Motley and his six coconspirators. Motley was charged with (and went to trial on) one count of conspiracy to possess with intent to distribute, and to distribute, oxycodone and hydrocodone, in violation of 21 U.S.C. §§ 841(a)(1), 846; four counts of distribution of oxycodone, in violation of 21 U.S.C. § 841(a)(1); and one count of distribution of hydrocodone, in violation of 21 U.S.C. § 841(a)(1).[7]

Motley moved to suppress the evidence obtained from the two tracking warrants, arguing that they rested on an unconstitutional warrantless search of his PMP database records. He also argued that the wiretap warrant was invalid because the supporting affidavit failed to show that there was probable cause to believe that he was a member of a drug trafficking organization and failed to show the required necessity for electronic surveillance.

The district court denied the motion to suppress. It determined that the search of the PMP database without a

---

[6]     Mail cover is the process by which a nonconsensual record is made of any data appearing on the outside cover of any sealed or unsealed class of mail matter, or by which a record is made of the contents of any unsealed class of mail matter as allowed by law . . . .

39 C.F.R. § 233.3(c)(1).

[7] Motley was also charged with distribution of methamphetamine, but that count was dismissed.

warrant did not violate Motley's Fourth Amendment rights because he had no reasonable expectation of privacy in the challenged PMP database information.[8]

The district court also rejected Motley's challenges to the wiretap warrant. The court found probable cause, as the affidavit established that "(1) the six codefendants were well-acquainted with each other[,] (2) Motley and Jeannette were regularly obtaining large quantities of opioids from Math, and (3) Motley was regularly selling opioids to Slater and other individuals, including confidential sources." The court determined that that information established probable cause to believe that Motley was engaged in a drug trafficking conspiracy. The district court found the wiretap

---

[8] Because it is unnecessary, we do not address the district court's alternative determination that, even if the search violated Motley's Fourth Amendment rights, the good-faith exception to the exclusionary rule barred suppression of the evidence obtained pursuant to the warrant. We also need not decide whether any error was harmless. The concurrence takes issue with our approach. But the issue—whether law enforcement may search opioid prescription records maintained in Nevada's PMP database—was squarely presented below, the district court decided it, and the parties fully briefed it on appeal. We believe that guidance is needed, as the parties request, on this important issue, particularly given the government's recent attempts to access prescription databases without warrants, which is likely to persist due to the existing opioid crises. *See* Sacco, *supra* note 2, at 26 ("In recent years, to investigate violations of the federal Controlled Substances Act (CSA), the DEA has demanded access to certain PDMP data without a court order or search warrant . . . ."); U.S. Dep't of Just., Civ. Div., *Opioid Enforcement Effort* (Mar. 22, 2023), https://www.justice.gov/civil/consumer-protection-branch/opioid ("With more than 84,000 Americans dying annually from prescription drug and synthetic opioid overdoses, the Department of Justice is committed to using every available tool to prevent overdose deaths and hold accountable those responsible for the opioid crisis." (footnote omitted)).

necessary because the affidavit showed that officers considered less intrusive methods and reasonably determined that they would have been ineffective.

A jury convicted Motley on all counts. The court sentenced him to 179 months' imprisonment on each count, to be served concurrently, and to be followed by five years of supervised release. Motley timely appealed his conviction and sentence, raising several issues. In this opinion, we address Motley's challenges to the district court's denial of his motion to suppress evidence obtained from the tracking warrants and the court's determination that the wiretap warrant was both necessary and supported by probable cause.

## II.  STANDARD OF REVIEW

We review de novo the denial of a motion to suppress. *United States v. Magdirila*, 962 F.3d 1152, 1156 (9th Cir. 2020). In reviewing the district court's probable cause determination as to the wiretap, we look "only to the four corners of the wiretap application" and "will uphold the wiretap if there is a 'substantial basis' for . . . findings of probable cause." *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995) (quoting *United States v. Stanert*, 762 F.2d 775, 779 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985)). We review for abuse of discretion the district court's decision that the wiretap was necessary. *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

## III.  DISCUSSION

### A.  Tracking Warrants

Motley argues that law enforcement's warrantless search of his opioid prescription records in the PMP database violated the Fourth Amendment, and without that illegally

obtained information, the evidence was insufficient to support issuance of the tracking warrants.[9] Thus, according to Motley, the district court erred in denying his motion to suppress evidence obtained from the tracking warrants. We reject Motley's argument, as we agree with the district court that there was no Fourth Amendment violation because Motley had no legitimate expectation of privacy in his opioid prescription records maintained in the PMP database.[10]

"[A] criminal defendant may invoke the protections of the Fourth Amendment only if he can show that he had a *legitimate* expectation of privacy in the place searched or the item seized." *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007). "This expectation is established where

---

[9] Motley does not argue that the affidavits supporting the tracking warrants were insufficient if his opioid prescription records are considered. His challenge therefore depends on whether law enforcement's search of his opioid prescription records violated the Fourth Amendment.

[10] We also reject Motley's argument that the affidavit's statement that his 279 MME/day "prescription pattern can be an indicator for opioid abuse or diversion" was unsupported. The statement was supported by CDC guidance at the time, which explained that most experts agree that dosages greater than 50 MME/day "increases overdose risk without necessarily adding benefits for pain control or function," and dosages should not be increased to greater than 90 MME/day "without careful justification based on diagnosis and on individualized assessment of benefits and risks." CDC, *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016* (Mar. 15, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

Motley also contends that the district court erred in denying his request for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). But he waived this challenge, as he mentions it only in passing in his briefs and does not provide any supporting arguments. *See United States v. Stoterau*, 524 F.3d 988, 1003 n.7 (9th Cir. 2008).

the claimant can show: (1) a subjective expectation of privacy; and (2) an objectively reasonable expectation of privacy." *Id.* "An expectation of privacy is legitimate if it is one which society accepts as objectively reasonable." *United States v. Thomas*, 447 F.3d 1191, 1196 (9th Cir. 2006).

Assuming, as the district court did, that Motley had a subjective expectation of privacy in his opioid prescription records, the question is whether that expectation was objectively reasonable. While this is an issue of first impression for our court, the First Circuit recently addressed it in *United States Department of Justice v. Ricco Jonas*, 24 F.4th 718 (1st Cir.), *cert. denied sub nom. Program Administrator of the New Hampshire Controlled Drug Prescription Health & Safety Program v. Department of Justice*, 143 S. Ct. 207 (2022).

The First Circuit held that individuals do not have a reasonable expectation of privacy in prescription drug records maintained in New Hampshire's Prescription Drug Monitoring Program ("PDMP") database. *Id.* at 736–37. The court focused on the closely regulated nature of prescription drugs under both federal and New Hampshire law. Under the Controlled Substances Act ("CSA"), "every registered dispenser of a controlled substance must maintain a complete and accurate record of each such substance disposed of," *id.* at 735, and keep those records for at least two years "for inspection and copying by officers or employees of the United States authorized by the Attorney General," *id.* (quoting 21 U.S.C. § 827(b)). Similarly, New Hampshire's laws require practitioners to maintain records on all controlled drugs and keep such records "open for inspection to federal, state, county and municipal law enforcement officers and others whose duty it is to enforce

the laws of New Hampshire or of the United States relating to controlled drugs." *Id.* (cleaned up) (quoting N.H. Rev. Stat. Ann. § 318-B:12(II)). New Hampshire also requires the "report[ing] to the PDMP information about the dispensed drug, including the patient's name and address, the drug and quantity dispensed, and the date of dispensing." *Id.*

The court concluded:

> [I]n light of the intense government scrutiny to which prescription drug records are subject and the availability of those records for inspection without the need of court intervention under both state and federal law, a person does not have a reasonable expectation that the information contained in prescription drug records will be kept private and free of government intrusion.

*Id.* at 736–37.

This analysis is persuasive. For over half a century, the federal government has regulated opioids under the CSA. Pub. L. No. 91-513, Tit. II, 84 Stat. 1236, 1250 (1970) (codified at 21 U.S.C. § 812) (classifying as Schedule II drugs any opiate produced "by extraction from substances of vegetable origin, or independently by means of chemical synthesis"). As the First Circuit recognized, under the CSA, registered dispensers of controlled substances must maintain records of each substance dispensed and make those records available for inspection and copying by the Attorney General for at least two years. *Ricco Jonas*, 24 F.4th at 735; *see also* 21 U.S.C. § 827(a)(3), (b). And since the CSA's inception, the Attorney General has had the authority to obtain these

records without a warrant when investigating crimes related to controlled substances.  Pub. L. No. 91-513, Tit. II, 84 Stat. 1236, 1272 (1970) (codified at 21 U.S.C. § 876(a)) ("[T]he Attorney General may . . . require the production of any records . . . which the Attorney General finds relevant or material to [an] investigation [related to controlled substances]."); *see also Ricco Jonas*, 24 F.4th at 735 ("Both federal and New Hampshire laws regulate controlled substances by requiring pharmacies . . . to maintain prescription drug records and keep them open for inspection by law enforcement officers without the need of a warrant.").

Nevada's laws track the CSA's close, extensive regulation of opioid prescriptions.  *See* Nev. Rev. Stat. § 453.162 (establishing the PMP database); Nev. Admin. Code § 453.520(2)(a) (classifying "opium and opiate" as a Schedule II drug).  In general, all prescription records must be kept for at least two years and are open to inspection by the "[State Board of Pharmacy] and by inspectors of the Food and Drug Administration and agents of the Investigation Division of the Department of Public Safety." Nev. Rev. Stat. § 639.236(1), (3).  Nevada established the PMP database nearly thirty years ago to prevent the illegal use of controlled substances.  *See* 1995 Nev. Stat. 1433 ("The [PMP] program must . . . [b]e designed to provide information regarding the inappropriate use of controlled substances . . . to . . . appropriate state agencies in order to prevent the improper or illegal use of such controlled substances.").  The state entities in control of the database have always had the obligation to report suspected illegal activity to law enforcement and to give law enforcement relevant information from the PMP database.  *Id.*; Nev. Rev. Stat. § 453.164(3)(a).  Certain law enforcement agency employees can also access the PMP database without a

warrant to "[i]nvestigate a crime related to prescription drugs." Nev. Rev. Stat. § 453.165(4)(a).

Opioid use and prescriptions have thus been subject to well established and extensive regulation, including disclosure of opioid records to law enforcement *without* a warrant. On the undisputed historical record, for more than fifty years, society's expectation has been that law enforcement would closely monitor and have access to opioid prescription records. *See Ricco Jonas*, 24 F.4th at 739 ("[S]ociety's expectation has been for decades that law enforcement would have access to prescription drug records and would closely monitor the prescription and use of controlled substances.").[11]

---

[11] The concurrence asserts that the statutory record-keeping requirements and laws that allow law enforcement officers to access such records without a warrant "do[] not answer the constitutional question." Concurrence at 28. We disagree. While such laws may not be dispositive, we agree with the First Circuit that such laws inform the analysis of whether an expectation of privacy is objectively reasonable. *See Ricco Jonas*, 24 F.4th at 734–35.

The concurrence also points to two cases that reached conclusions contrary to *Ricco Jonas*. Concurrence at 28–29. We find those cases unpersuasive. In *State v. Skinner*, the Supreme Court of Louisiana based its holding on "federal jurisprudence *and Louisiana's constitutional requirement of a heightened privacy interest* for its citizens." 10 So. 3d 1212, 1218 (La. 2009) (emphasis added); *see also id.* at 1215 ("Louisiana provides protection not only against unreasonable *searches* and *seizures,* but [its] Constitution explicitly protects against unreasonable invasions of *privacy.*"). Here, Motley points to no similar heightened privacy protection under Nevada's constitution.

We also find unpersuasive the analysis in *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Administration*, as the district court's holding rested on the view that prescription records

Motley argues that we should nonetheless find that his subjective expectation of privacy was objectively reasonable because society has recognized as reasonable, patients' expectations of privacy in their medical records.  The First Circuit declined to equate prescription drug records to all other medical records, and we again find its analysis persuasive.  *Id.* at 735–36.  Prescription opioid records are unlike general medical records.  Opioid prescription records are only a "subset of medical records . . . [that] do not generally or necessarily contain the more personal and intimate information that other medical records do."  *Id.* at 736 (noting that general medical records contain "'sensitive medical history and other information, including about mental illnesses, learning disabilities, birth defects, illicit drug use, pregnancy terminations, domestic-violence history,' patients' complaints and symptoms, and 'the patients' family members,' among others" (quoting *Eil v. U.S. DEA*, 878 F.3d 392, 396 (1st Cir. 2017)).  Additionally, "unlike prescription [opioid] records, medical records are not subject to pervasive regulatory disclosures under both federal and state law."  *Id.*  These crucial differences justify treating opioid prescription records differently from general medical records for Fourth Amendment purposes.[12]

_____

should be treated the same as all other medical records.  998 F. Supp. 2d 957, 966 (D. Or. 2014), *rev'd on other grounds,* 860 F.3d 1228, 1231 (9th Cir. 2017).  As discussed below, we reject that view.

[12] We express no view as to the extent patients have a reasonable expectation of privacy in other types of medical or prescription records. We only decide that Motley had no objectively reasonable expectation of privacy in his opioid prescription records maintained in Nevada's PMP database, given the long-standing and pervasive regulation of opioids as a controlled substance and regulatory disclosure of opioid

Given the long-standing and pervasive regulation of opioids as a controlled substance and regulatory disclosure of opioid prescription records, Motley had no objectively reasonable expectation of privacy in his prescription opioid records maintained in Nevada's PMP database, and thus his Fourth Amendment challenge to the tracking warrants fails. We therefore affirm the district court's order denying suppression of the evidence obtained from the two tracking warrants.

## B. Wiretap Warrant

Motley also challenges the district court's determination that the wiretap warrant was necessary and was supported by probable cause. To authorize a wiretap warrant under 18 U.S.C. § 2516, the judge must find, as relevant here, that "there is probable cause for belief that an individual is committing, has committed, or is about to commit" certain offenses. 18 U.S.C. § 2518(3)(a).[13] "Probable cause" means a "fair probability." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The judge must also find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). In determining whether the government has shown necessity, we employ a "common sense approach," using "a standard of reasonableness to evaluate the government's good faith effort to use alternative investigative means or its failure to

---

prescription records. Thus, the concurrence is simply wrong in stating that our holding applies to "*any* prescription record." Concurrence at 28.

[13] Motley does not challenge the other probable cause requirements under § 2518. *See* 18 U.S.C. § 2518(3)(b), (d).

do so because of danger or low probability of success." *Blackmon*, 273 F.3d at 1207.

Motley's probable cause challenge fails because his suppression motion fails. Motley makes no alternative "lack of probable cause" argument. But even if Motley had made such an argument, it too would have failed. The wiretap affidavit established that Motley and several others, who were in frequent contact with Motley, were all obtaining large amounts of prescription opioids from the same physician; that Motley was buying the prescriptions for himself and others; and that Motley and at least one other coconspirator were selling the prescribed pills. This evidence provided a "substantial basis" for the district court's finding that there was probable cause that Motley was engaged in a conspiracy to illegally distribute prescription opioids. *Meling*, 47 F.3d at 1552.

Turning to necessity, the affidavit explained, in specific detail, law enforcement's investigative methods, why those methods had been exhausted, and why other methods would likely be ineffective in identifying the members and scope of the conspiracy. As just one example, the affidavit explained that it would not be "feasible in the Reno area to introduce a UC [undercover law enforcement agent] into a DTO [drug trafficking organization] . . . at a level high enough to accomplish the goals of the investigation," and "[g]iven the relatively low-level contact [the confidential source] has had with Motley in recent months, it also would likely raise suspicion that [the confidential source] is introducing a UC to Motley, who is a stranger to Motley." Given those and other facts, the affidavit explained that "Motley [would be] unlikely to reveal the inner workings of his DTO with the UC" and thus undercover operations would likely be unsuccessful. Based on the information in the affidavit, the

district court did not abuse its discretion in finding that the wiretap was necessary. *See Blackmon*, 273 F.3d at 1207.

Motley's counterarguments are unpersuasive. He claims that the government had all the evidence it needed "to prosecute [*him*] on the drug distribution counts." Even if that were true, it would not negate necessity, because we have "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators." *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir. 1990).

Motley also argues that the government could have employed other methods. But, as noted above, the affidavit explained why all the alternative methods identified by Motley would probably be ineffective or were tried and had failed.

We are also unconvinced by Motley's claim that the government "manufacture[d] necessity" because it had identified some conspirators and knew that Dr. Math was their source. The government's need for a wiretap is not negated simply because it managed to obtain some evidence of a conspiracy without a wiretap. *See United States v. McGuire*, 307 F.3d 1192, 1199 (9th Cir. 2002) ("[T]here [is] a powerful government interest in identifying *all conspirators and the full scope* of the conspiracy." (emphasis added)); *see also id.* at 1198 ("Because the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses, . . . the government is entitled to more leeway in its investigative methods when it pursues a conspiracy." (footnote and citation omitted)).

In sum, the district court did not err in determining that the wiretap was supported by probable cause and was necessary, as the detailed, case-specific information in the affidavit established probable cause and showed that other investigative methods would likely have been unsuccessful in identifying the full scope of the conspiracy.

## IV.  CONCLUSION

We affirm the district court's order denying the motion to suppress because Motley had no reasonable expectation of privacy in his opioid prescription records maintained in Nevada's PMP database.  We also affirm the district court's determination that the wiretap warrant was supported by probable cause and was necessary.  The supporting affidavit contained more than sufficient evidence establishing probable cause that Motley was engaged in a conspiracy to illegally distribute prescription opioids.  It also contained sufficient information for the court to reasonably conclude that a wiretap was necessary to identify the full scope of the conspiracy.

**AFFIRMED.**

GRABER, Circuit Judge, concurring in part and concurring in the judgment:

I concur in Part III-B of the opinion, which correctly rejects Defendant's challenges to the wiretap warrant. But I do not join Part III-A of the opinion, which affirms the district court's denial of Defendant's motion to suppress the evidence obtained as a result of two tracking warrants. Two alternative grounds support the district court's conclusion: the good-faith exception and harmlessness. I therefore concur in the judgment. The majority opinion declines to reach either of those alternative grounds and, instead, holds that Defendant did not have an objectively reasonable expectation of privacy in the identity and dosage of his prescription medications. We need not and, in my view, should not reach that substantial legal question in this case.

A. The Good-Faith Exception Applies, and Any Error Was Harmless.

As the district court held, the good-faith exception applies here. The Nevada statute clearly authorized the officer's access to the database, and the officer acted "in objectively reasonable reliance" on the statute. Illinois v. Krull, 480 U.S. 340, 349 (1987); see also Davis v. United States, 564 U.S. 229, 239 (2011) (citing Krull for the rule that the good-faith exception extends "to searches conducted in reasonable reliance on subsequently invalidated statutes"). Whatever doubts one may have about the constitutionality of the Nevada statute, the fact that both of my colleagues and a unanimous panel of the First Circuit have held that persons lack a pertinent reasonable expectation of privacy means that, at a minimum, the statute is not "clearly unconstitutional." Krull, 480 U.S. at 349. "Unless a statute is clearly unconstitutional, an officer

cannot be expected to question the judgment of the legislature that passed the law." Id. at 349–50.

In addition, any error here was harmless. Even assuming that the information from the prescription database should have been excluded from Detective Johnson's affidavit, the remaining assertions in the affidavit provided probable cause. See, e.g., United States v. Nora, 765 F.3d 1049, 1058 (9th Cir. 2014) (holding that a "warrant remains valid if, after excising the tainted evidence, the affidavit's remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant" (citation and internal quotation marks omitted)).

A confidential informant ("CI") who had proved reliable during an earlier controlled drug purchase explained, in some detail, Defendant's scheme. Detective Johnson reported:

> The CI told me that [Defendant] comes from California and meets with a physician at [a specific office] approximately every 30 days. [Defendant] then meets this physician and the physician writes [Defendant] a prescription for Oxycodone. In addition, the physician gives [Defendant] a stack of prescriptions in other people's names for [Defendant] to sell to those people. . . . The CI's wife has received a prescription in her name from the physician via [Defendant], but has never actually seen the physician personally. The

> CI also stated that [Defendant] fills most [of] his prescriptions [at a specific pharmacy].

Detective Johnson verified some of the information given by the informant. For example, Detective Johnson determined that Defendant's car was registered in California. Similarly, the informant told Detective Johnson that Defendant was staying at a specific hotel in town, and officers saw Defendant at that hotel the next day. Finally, Detective Johnson reported that Defendant's criminal history, including a series of arrests for drug trafficking and possession, was consistent with the informant's information.

In sum, an informant—known to be reliable—described in detail a criminal scheme in which the informant's wife had participated personally; officers confirmed some aspects of the informant's description; and officers confirmed that Defendant's criminal history was consistent with the scheme. Accordingly, independent of the information derived from the prescription database, the affidavit supported a finding that there was a "fair probability" that the tracking device would yield evidence of a crime. United States v. Kvashuk, 29 F.4th 1077, 1085 (9th Cir. 2022), cert. denied, 143 S. Ct. 310 (2022); see, e.g., Nora, 765 F.3d at 1059 ("[C]riminal history can be helpful in establishing probable cause, especially where the previous arrest or conviction involves a crime of the same general nature as the one the warrant is seeking to uncover." (citation and internal quotation marks omitted)); United States v. Rowland, 464 F.3d 899, 907 (9th Cir. 2006) ("[A] known informant's tip is thought to be more reliable than an anonymous informant's tip."); id. at 908 ("[A]n informant with a proven track record of reliability is considered more reliable than an unproven informant."); id. ("[An] informant's tip is considered more

reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information."); id. ("[A] tip that provides detailed predictive information about future events that is corroborated by police observation may be considered reliable.").

I would uphold the denial of the motion to suppress on those alternative grounds:  the good-faith exception and harmlessness.

> B. Whether a Person Has an Objectively Reasonable Expectation of Privacy in Prescription Records is a Significant and Debatable Legal Question that We Ought Not Reach.

The majority opinion decides that Defendant lacked an objectively reasonable expectation of privacy in his prescription records.  Because it is unnecessary to reach that significant legal issue, and because I have doubts about the majority opinion's conclusion, I would not reach that issue.

Federal courts have "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable."  O'Connor v. Ortega, 480 U.S. 709, 715 (1987) (plurality opinion).  "[T]he reasonableness of an expectation of privacy . . . differ[s] according to context." Id.  In concluding that persons lack a reasonable expectation of privacy in their prescription records, the majority opinion offers a plausible assessment of several relevant factors.  But an alternative approach, described below, might yield a different result.

As a general matter, people reasonably expect privacy in their personal medical records.  See, e.g., Norman-Bloodsaw v. Lawrence Berkeley Lab'y, 135 F.3d 1260, 1269 (9th Cir. 1998) ("The constitutionally protected privacy interest in

avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality."); see also Ferguson v. City of Charleston, 532 U.S. 67, 78 (2001) ("The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent."). As the Supreme Court has noted, "an intrusion on that expectation may have adverse consequences because it may deter patients from receiving needed medical care." Ferguson, 532 U.S. at 78 n.14.

Prescription records are a subset of medical records and, accordingly, are entitled to some measure of privacy. Prescription records may not disclose as much information as a person's entire hospital chart might. But prescription records can be extremely revealing, nonetheless. A knowledgeable person could tell, from prescriptions alone, that a person was undergoing treatment for a sensitive, private ailment, such as low testosterone or delayed puberty; weight loss associated with AIDS or chemotherapy; difficulty with conceiving; anxiety and panic disorders; or alcohol withdrawal or opioid use. The Supreme Court's observation about medical records generally applies with equal force to prescriptions specifically: "an intrusion on [an expectation of privacy in prescription records] may have adverse consequences because it may deter patients from receiving needed medica[tions]." Id.

Nor is Nevada's statute tailored in any way to opioids or to those drugs with the most potential for abuse. The statute applies broadly to all drugs on Schedules II-V. (Schedule I drugs have no medical use.) A more narrowly tailored statute—for example, a law that permitted warrantless searches of only the most dangerous prescription drugs,

coupled with a requirement that persons filling those specific prescriptions be warned that their prescription data could be subject to search—likely would pass constitutional muster. But Nevada's law indiscriminately allows warrantless searches of any and all prescriptions, even those drugs with no history of abuse or resale, and even those drugs that reveal specific medical histories. The majority opinion at times focuses its analysis on opioids, but its holding is broad: persons have no reasonable expectation of privacy in <u>any</u> prescription record.

Finally, the other laws cited by the majority opinion do not fully establish that persons lack a reasonable expectation of privacy. Congress and state legislatures permissibly may impose a <u>record-keeping</u> obligation on medical providers, but those laws do not answer the question relevant here: does the Constitution permit law enforcement officers to rifle through those records solely in search of evidence of a crime? Similarly, the fact that Congress granted the Attorney General a wide subpoena power to "require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material," 21 U.S.C. § 876(a), does not answer the constitutional question. That subpoena power—like the searching authority granted by state law—is limited by the Fourth Amendment's protection against unreasonable searches.

Some jurisdictions have concluded, contrary to the majority opinion's conclusion, that persons <u>do</u> have a reasonable expectation of privacy in their prescription medications. For example, the Supreme Court of Louisiana has held that a warrant is required for an investigative search of prescription records, because "the right to privacy in one's

medical <u>and prescription</u> records is an expectation of privacy that society is prepared to recognize as reasonable." <u>State v. Skinner</u>, 10 So. 3d 1212, 1218 (La. 2009) (emphasis added). Closer to home, the federal district court for the District of Oregon agreed, concluding in a well-reasoned opinion concerning Oregon's analogue to Nevada's prescription database that the intervenors' "subjective expectation of privacy in their prescription information is objectively reasonable." <u>Or. Prescription Drug Monitoring Program v. U.S. DEA</u> (<u>Or. PDMP</u>), 998 F. Supp. 2d 957, 966 (D. Or. 2014), <u>rev'd on other grounds</u>, 860 F.3d 1228 (9th Cir. 2017). On appeal, we held that the intervenors lacked standing, and we therefore did not reach the pertinent Fourth Amendment question. <u>Or. PDMP</u>, 860 F.3d at 1234–35. But we recognized the weightiness of the issue:

> We acknowledge the particularly private nature of the medical information at issue here and thus do not question the seriousness of Intervenors' fear of disclosure. Nor do we imply that this concern is unreasonable.

<u>Id.</u> at 1235.

In sum, the majority opinion reaches an important issue that has divided courts: whether a person has a reasonable expectation of privacy in prescription records. Because I have doubts about the correctness of the majority opinion's conclusion, I would choose not to reach the issue; we should wait for a case in which the result matters to the outcome. For those reasons, I concur in the opinion only in part, but I concur in the judgment in full.